IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division



FILED
IN OPEN COURT

JUN 1 1 2020

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

UNITED STATES OF AMERICA

v.

GEORGE SHAO MIN YU,

Defendant.

No. 1:19-CR-334

Hon. Leonie M. Brinkema

## STATEMENT OF FACTS

The United States and the Defendant, GEORGE SHAO MIN YU (hereafter "YU"),

stipulate that the allegations contained in Count 3 of the Indictment and the following facts are

true and correct, and that had the matter gone to trial, the United States would have proven the

following facts beyond a reasonable doubt:

1.      From in and around at least 2016 and continuing through in and around December 2019,

within the Eastern District of Virginia, and elsewhere, the defendant YU, did knowingly and

intentionally combine, conspire, confederate, and agree with others, both known and unknown,

to commit an offense against the United States, in violation 18 U.S.C. § 1956, to wit: to conduct

and attempt to conduct financial transactions affecting interstate and foreign commerce, which

involved the proceeds of a specified unlawful activity, that is, conspiracy to distribute cocaine,

knowing that the transactions were designed in whole and in part to conceal and disguise the

nature, location, source, ownership, and control of the proceeds of the conspiracy as alleged in

Count One, and knowing that the property involved in the financial transactions represented the

proceeds of some form of unlawful activity, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and

1956(h).

2.      YU joined a conspiracy whose membership and leadership, at various times, included Xizhi Li (Li), Jianxing Chen (J.Chen), Qiyun Chen (Q.Chen), Xueyong Wu (Wu), and others. The purpose of this organization was to help foreign drug trafficking organizations (DTOs) gather, launder, and repatriate proceeds derived from the DTOs' unlawful drug trafficking activities in the United States. Those drug trafficking activities primarily involved cocaine.

3.      The conspiracy cultivated relationships with DTOs to obtain as many "contracts" as possible to move and launder their United States-based drug proceeds. In exchange, YU and his co-conspirators received a "commission" for conducting these pick-ups and arranging these transactions, which represented a percentage of the involved funds.

4.      YU used secretive and clandestine means to facilitate the movement of drug proceeds within the United States. For example:

> a.  YU transported drug proceeds across the United States so that additional money-laundering transactions could be conducted by other individuals several states away from where the proceeds were generated;
>
> b.  YU and his co-conspirators operated or had access to bank accounts in the United States, China, Mexico, and elsewhere. Some of these accounts were operated under the names of fictitious identities. YU and his co-conspirators used these accounts to deposit and conduct financial transactions with drug proceeds. This included transmitting the funds to accounts in China where the money was used to purchase Chinese goods. It also included using the funds to purchase consumer goods in the United States that were ultimately shipped to China for resale. Successful completion of these transactions generated Chinese currency known as renminbi (RMB). Merchants in Latin America seeking to import goods from

2

China purchased RMB from LI and his co-conspirators using the local currency of the Latin-American country. These merchants used the RMB they bought from LI to purchase goods in China and import them into Latin-American countries. Acquisition of the Latin-American currencies, often Mexican pesos, enabled LI to provide the DTOs with their drug proceeds in the currency used in their home countries which disguised the illegal nature and source of the funds used by the DTOs.

c. YU operated a restaurant in Los Angeles County, California, known as the "Tasty Garden." YU used this restaurant as part of his money-laundering activities.

5. Between February and March 2016, YU made at least three trips from Los Angeles to Chicago, Illinois, to pick-up proceeds generated by the unlawful sale of drugs. YU was aware that he was picking-up and transporting drug proceeds. YU then transported these proceeds from Chicago to Los Angeles by car. In so doing, YU was acting at the direction of Li.

6. On or about March 11, 2016, YU was detained by law enforcement in Seward County, Nebraska, while transporting approximately $340,000. This money was generated by unlawful cocaine sales in the United States. Law enforcement seized this money (although it was returned to YU at a later date). YU obtained this money at or near Chicago, Illinois, to transport it to Los Angeles, California, and was in the process of doing so when contacted by law enforcement.

7. Shortly thereafter, YU contacted Li to inform Li that the money had been seized. Li informed YU that he (Li) would re-pay the DTO for the lost money. Li instructed YU to re-pay him (Li) by sending money to one of Li's BBVA Compass accounts in Miami, which YU did through third party depositors.

3

8.      Throughout 2016 and 2017, YU continued to transport and assist others in transporting drug proceeds in the United States.  During this period, YU was, at times, acting at the direction of J.Chen, who was arranging for the transportation and laundering of cocaine proceeds on behalf of Li.

9.      In addition to YU, J.Chen employed several couriers whose job was to conduct money pickups in the United States of funds owed to foreign DTOs.

10.     One such courier was an individual hereafter known as cooperating source-1 (CS-1). Throughout 2016, CS-1 picked up money derived from the unlawful sale of cocaine in Virginia Beach, Virginia, located within the Eastern District of Virginia.  During this same period, CS-1 traveled through the Eastern District of Virginia to obtain and transport cocaine proceeds.

11.     The acts described above were done willfully and knowingly and with the specific intent to violate the law, and not by accident, mistake, inadvertence, or other innocent reason.  This statement of fact does not contain each and every fact known to the defendant and to the United States, and it is not intended to be a full enumeration of all the facts surrounding the defendant's charges.

12.     The defendant waives any rights that the defendant may have under Fed. R. Crim. P. 11(f), Fed. R. Evid. 410, the United States Constitution, and any federal statute or rule in objecting to the admissibility of the Statement of Facts in any proceeding.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

Date: 6/11/2020

By: _____

David A. Peters
Michael P. Ben'Ary
Assistant United States Attorneys
Eastern District of Virginia
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Tel.: (703)-299-3700

Deborah Connor
Chief, Money Laundering and Asset Recovery
Section, U.S. Department of Justice, Criminal
Division

For _____

Stephen Sola
Kerry Blackburn
Trial Attorneys

Defendant's Stipulation and Signature

After consulting with my attorney, I hereby stipulate that the above Statement of Facts is true and accurate, and that if the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

Date: 6/11/2020

George Shao Min Yu,
Defendant

Defense Counsel's Signature

I am the attorney for Defendant in this case, George Shao Min Yu.  I have carefully reviewed the above Statement of Facts with him.  To my knowledge, his decision to stipulate to these facts is informed and voluntary.

Date: 6/11/20

Shaun Khojayan, Esq.
Jeffrey Zimmerman, Esq.
Counsel for Defendant

6